# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SASHA PALMER | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Civil Action No: |
| v. | ) | |
| | ) | |
| METROPOLITAN GOVERNMENT OF | ) | Judge: |
| NASHVILLE AND DAVIDSON | ) | |
| COUNTY, TENNESSEE; | ) | Magistrate Judge: |
| | ) | |
| HOLLY GENUALDI; | ) | |
| | ) | JURY DEMAND |
| CHARLES AGIUS; | ) | |
| | ) | |
| MICHAEL SWONER | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

1. Plaintiff brings this action for damages alleging that Defendants violated Plaintiffs' federal constitutional right against false arrest and illegal searches on November 15, 2023. Plaintiff seeks compensation and other just and appropriate relief for this violation of her legal rights.

## **PARTIES**

2. **Plaintiff Sasha Palmer ("Ms. Palmer")** is an adult resident of Davidson County, Tennessee.

1

3. **Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro")** is a governmental entity organized under the laws of the State of Tennessee and located in Davidson County, Tennessee.

4. **Defendant Holly Genualdi ("Officer Genualdi")** is an adult resident of Tennessee, who on information and belief resides in Davidson County, Tennessee. At all times relevant to this complaint, Officer Genualdi was a sworn police officer employed by the Metro Nashville Police Department ("MNPD").

5. **Defendant Charles Agius ("Officer Agius")** is an adult resident of Tennessee, who on information and belief resides in Davidson County, Tennessee. At all times relevant to this complaint, Officer Agius was a sworn police officer employed by MNPD.

6. **Defendant Michael Swoner ("Sergeant Swoner")** is an adult resident of Tennessee, who on information and belief resides in Davidson County, Tennessee. At all times relevant to this complaint, Sgt. Swoner was a sworn police officer employed by MNPD with the rank of sergeant.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants reside in this district and the events at issue in this lawsuit occurred in this district.

## FACTUAL BACKGROUND

### A. Background

8. At the time of the incident at issue in this lawsuit, Plaintiff Ms. Palmer was a thirty-eight-year-old professional, employed in the medical services industry.

2

9. Ms. Palmer had, and has, no criminal record.

10. Ms. Palmer is African-American.

11. Ms. Palmer had, and has, a lawful handgun carry permit issued by the State of Tennessee.

12. Ms. Palmer owns a handgun.

**B. Ms. Palmer is nearly run over**

13. For several months in the summer and fall of 2023, Ms. Palmer, enjoyed taking daily walks near her home in Antioch, Tennessee during her lunch break.

14. Ms. Palmer appreciated the benefits that these daily walks provided for her physical and emotional health, and built a habit and a routine around the walks.

15. As authorized by her permit, Ms. Palmer carried her handgun with her in her purse during these walks. Ms. Palmer carried her handgun with her for protection.

16. In September 2023, Ms. Palmer's uncle passed away suddenly and unexpectedly. Ms. Palmer and her uncle were close, and his sudden death hit her hard. After Ms. Palmer's uncle passed, her daily walks took on an even greater significance as the regimen helped her as she attempted to process her grief.

17. On November 15, 2023, Ms. Palmer approached the intersection of Bell Road and Murfreesboro Road as she took her daily walk.

18. At that intersection, Ms. Palmer witnessed a truck careening toward her at high speed.

19. Ms. Palmer ran as quickly as she could to get out of the truck's path.

20. Ms. Palmer managed to avoid being run over, and then watched as the truck crashed.

21. At first, Ms. Palmer thought that the driver might be experiencing a medical emergency.

22. However, Ms. Palmer then watched as the driver of the truck, a young African American male, jumped out and ran away.

3

23. Ms. Palmer then saw five Metro Nashville Police Department ("MNPD") cruisers closing in at high speed. She also noticed an MNPD helicopter in the air.

24. A female employee of a nearby check cashing business popped her head out the door, and asked Ms. Palmer if she was ok. Ms. Palmer said that she was.

25. However, in reality Ms. Palmer was terrified of what had just happened. She headed toward her home.

### C. Sgt. Swoner orders Ms. Palmer detained

26. Defendants Genualdi, Agius, Swoner, and several other MNPD officers were involved in the pursuit of the fleeing truck driver.

27. The MNPD officers noticed Ms. Palmer leaving the scene. Communicating with each other over a radio channel, the question arose amongst the officers whether Ms. Palmer had been in the truck with the fleeing driver.

28. This incident occurred in view of a Metro Davidson Housing Authority ("MDHA") residential neighborhood equipped with surveillance cameras. MNPD has a surveillance unit, "Overwatch," that monitors these surveillance cameras in "realtime" and communicates observations from these cameras to officers involved in relevant incidents.

29. MNPD's Overwatch unit specifically advised the Defendants and other officers involved that Ms. Palmer had not been in the fleeing truck.

30. Overwatch further specified that Ms. Palmer and had almost been hit by the truck when it careened out of control and crashed.

31. Notwithstanding the statements by the Overwatch unit clearing Ms. Palmer of any suspicion of wrongdoing, Sgt. Swoner ordered the other officers involved in the pursuit to detain Ms. Palmer.

4

## D. MNPD illegally arrests and searches Ms. Palmer

32. As Ms. Palmer was walking toward her home, Officer Genualdi drove up to Ms. Palmer, activated her "blue lights," ordered Ms. Palmer to put her hands up, and informed Ms. Palmer that she was detaining her.

33. Ms. Palmer asked Genualdi, "What for?"

34. Officer Genualdi took Ms. Palmer's purse, took her phone, and put her in handcuffs. Genualdi then told Ms. Palmer, "If you move, the cuffs will get tighter."

35. Officer Genualdi then patted down and frisked Ms. Palmer.

36. During the pat and frisk, Officer Genualdi put her hands on Ms. Palmer's vagina, buttock, and breast areas. Although the frisk was over Ms. Palmer's clothes, these touches were extremely invasive and made Ms. Palmer feel extremely uncomfortable. Ms. Palmer was wearing thin leggings at the time, providing only a minimal barrier between Genualdi's hands and Ms. Palmer's private body parts.

37. Numerous other drivers were passing by during this roadside arrest and search, which made the experience even more humiliating.

38. Ms. Palmer asked, "What am I being detained for? Did you catch the criminal?"

39. Officer Genualdi declined to answer Ms. Palmer's question, and just put Ms. Palmer in her patrol car.

40. Officer Agius joined Officer Genualdi.

41. Agius and Genualdi searched Ms. Palmer's purse while Ms. Palmer repeatedly stated, from the back seat of Genualdi's patrol car, that the officers did not have consent to search her purse.

42. The officers found Ms. Palmer's handgun in her purse.

5

43. Ms. Palmer explained that she had a carry permit for the handgun.

44. The officers inspected Ms. Palmer's carry permit, and confirmed that it was valid.

45. The MNPD Overwatch unit then advised the Defendants and other units for the second time that Ms. Palmer had not been in the fleeing truck.

46. Sgt. Swoner then went to Genualdi's patrol car, let Ms. Palmer out, took the handcuffs off of her, and gave her purse back.

47. Sgt. Swoner attempted to justify the arrest and search to Ms. Palmer based on the officers' discovery of Ms. Palmer's handgun, even though Ms. Palmer had a constitutional right and a lawful permit to possess her gun.

48. Sgt. Swoner then gave Ms. Palmer a ride home in his patrol car.

### E. Ms. Palmer vainly seeks justice through MNPD's biased complaint process

49. Ms. Palmer was traumatized by being falsely detained, searched, and violated.

50. On the day after the incident, November 16, 2023, Ms. Palmer filed a complaint with MNPD's Office of Professional Accountability ("OPA") against Officer Genualdi and Officer Agius, whose names Ms. Palmer had learned.

51. OPA Sgt. Jarred Frazier called Ms. Palmer about her complaint. Sgt. Frazier made statements to Ms. Palmer demonstrating that he was looking for a way to justify the MNPD officers' actions.

52. In a subsequent call, Sgt. Frazier suggested to Ms. Palmer that her complaint be resolved through mediation.

53. Ms. Palmer initially indicated that she would participate in mediation; but she later realized that mediation without accountability would not give her the peace she was looking for.

6

54. Ms. Palmer then declined to participate in mediation.

55. In lieu of investigating Ms. Palmer's complaint, OPA then closed it based on Ms. Palmer's choice to not participate in mediation.

56. On March 4, 2024, Ms. Palmer contacted OPA and asked that her complaint be investigated.

57. On March 6, 2024, Ms. Palmer filed a complaint with Nashville's Community Review Board ("NCRB") regarding the incident.

58. OPA investigators Jarred Frazier and Ron Carter investigated the incident.

59. The OPA investigators confirmed that MNPD Overwatch had informed the Defendants via radio prior to Ms. Palmer being detained that she had not been in the truck, and that she had in fact almost been hit by the truck.

60. Nonetheless, OPA exonerated Officers Genualdi and Agius of any wrongdoing.

61. In addition, OPA never even examined whether Sgt. Swoner had engaged in wrongdoing by giving the order to detain Ms. Palmer.

### F. MNPD's treatment of Ms. Palmer's case is consistent with MNPD's *de facto* policy and practice in handling officer violations of civil rights

62. OPA's biased resolution of Ms. Palmer's civil rights complaints is consistent with MNPD's decades-long *de facto* practice of almost always finding a way to justify MNPD officers' violations of citizens' constitutional rights in order to avoid imposing discipline.

63. Although OPA typically conducts what appear on paper to be thorough, well documented investigations – as happened here, where body cameras and audio dispatch recordings were collected and reviewed – the lens that OPA evaluates evidence of civil rights violations through is hopelessly biased in favor of officers. Thus, OPA typically applies what is effectively an "absolute certainty" burden of proof to citizen complaints of rights

violations, notwithstanding MNPD's nominal "preponderance" standard for imposing

administrative discipline.  This impossible burden is almost never met, resulting in almost

no citizen complaints of civil rights violations being sustained.

64. For many years, the statistics on MNPD's resolutions of citizen complaints of civil rights

violations has borne out this reality, with MNPD sustaining just a tiny fraction of citizen

complaints and ruling in officers' favor in most meritorious complaints – just as it did in

Ms. Palmer's case.

**65.** In addition, as it did here MNPD's *de facto* practice is to routinely find procedural "outs"

in order to avoid following through on complaints and investigations at all.  Whether Ms.

Palmer was or was not willing to participate in mediation, MNPD should have

investigated this incident to determine whether its officers violated the U.S. Constitution

and MNPD's "paper" policies.  Moreover, even if Ms. Palmer did not have sufficient

information when she made the complaint to name Sgt. Swoner in it, MNPD should have

added disciplinary charges against Swoner once the evidence revealed that he had given

the order to detain Ms. Palmer after being told by Overwatch that she was innocent.

### G.  MNPD has a lengthy history of discrimination against African Americans in roadside traffic related detentions and searches

66. For many years, MNPD has employed roadside detentions and searches as a means of

proactively attempting to detect criminal activity.

67. In 2016, a group known as Gideon's Army released the Driving While Black – Nashville

report, which documented statistical proof of race discrimination in MNPD's

discretionary roadside searches based on data obtained directly from MNPD.

68. In 2018, the New York University Policing Project issued a report documenting

additional statistical proof of race discrimination in MNPD's traffic stops.  The Policing

8

Project's report was based on data obtained from a collaborative review that the Policing Project had engaged in with MNPD.

69. In the July – September 2020 Davidson County Grand Jury report, the Grand Jury again raised the concern about potential race discrimination in traffic stops, citing both the Gideon's Army and Policing Project reports.

70. Over the years, numerous community organizations and individuals have expressed that they believe that MNPD engages in race discrimination and have called for change.

71. Notwithstanding the data and concerns raised by these reports, entities, and individuals, MNPD has steadfastly denied that its officers engage in race discrimination.

72. In maintaining this denial strategy, MNPD has likewise failed to seriously address its race discrimination problem, paying lip service in its paper policies to the importance of equal treatment while in reality tacitly permitting its officers to rely on racial profiling.

73. On information and belief, MNPD officers evidence particular implicit bias against African Americans who are armed.  Systemically speaking, MNPD officers tend to view American citizens like Ms. Palmer, who have no criminal history and who have a lawful right to be armed, as dangerous and subject to search and seizure just for possessing a lawful firearm.

9

## CLAIMS FOR RELIEF

### COUNT I: FALSE ARREST IN VIOLATION OF THE
### FOURTH AMENDMENT TO THE U.S. CONSTITUTION
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)

74. Plaintiff hereby reincorporates paragraphs 1 – 73 by reference.

75. On November 15, 2023, Defendant Genualdi arrested Ms. Palmer.

76. Defendant Swoner gave the order to detain Ms. Palmer.

77. Defendant Agius participated in the unlawful arrest, and assisted in keeping Ms. Palmer illegally detained.

78.  Defendants lacked probable cause to detain Ms. Palmer.

79. Defendants acted under color of state law in arresting Ms. Palmer.

80. Defendant Metro is responsible for the illegal arrest because of its systemic failure to discipline officers for conducting false arrests and illegal searches, leading to a custom of impunity for these types of Fourth Amendment violations.

81. The individual Defendants acted in blatant disregard for Ms. Palmer's constitutional rights, ignoring MNPD Overwatch's clear admonition given prior to the arrest that Ms. Palmer was innocent and free of even any suspicion of wrongdoing.

82. Defendants' illegal arrest caused Ms. Palmer to suffer a deprivation of liberty, physical discomfort, and severe emotional harm.

## COUNT II: ILLEGAL SEARCH IN VIOLATION OF THE
## FOURTH AMENDMENT TO THE U.S. CONSTITUTION
## (42 U.S.C § 1983)

### (ALL DEFENDANTS)

83. Plaintiff hereby reincorporates paragraphs 1 – 73 by reference.

84. On November 15, 2023, Defendant Genualdi frisked and patted down Ms. Palmer.

85. Defendants Genualdi and Agius then searched Ms. Palmer's purse notwithstanding Ms. Palmer's repeated protestations that she did not consent.

86. Sgt. Swoner caused these illegal searches by giving Genualdi and Agius the order to detain Ms. Palmer.

87. Defendants did not have reasonable suspicion to believe that Ms. Palmer was either armed or dangerous.

88. Defendants did not have probable cause to search Ms. Palmer's purse.

89. Defendants acted under color of state law in searching Ms. Palmer's person and property.

90. Defendant Metro is responsible for the illegal searches because of its systemic failure to discipline officers for conducting false arrests and illegal searches, leading to a custom of impunity for these types of Fourth Amendment violations.

91. Defendant Metro is also responsible for the illegal searches because the searches were conducted pursuant to an MNPD policy requiring officers to conduct such searches any time that a citizen is being detained for investigation, regardless of whether or not the investigatory detention is lawful.

92. The individual Defendants acted in blatant disregard for Ms. Palmer's constitutional rights, ignoring MNPD Overwatch's clear admonition given prior to the arrest and searches that Ms. Palmer was innocent.

11

93. Defendants' illegal searches caused Ms. Palmer to suffer a deprivation of liberty, physical discomfort, and severe emotional harm.

## COUNT III: RACE DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION
## (42 U.S.C § 1983)

### (ALL DEFENDANTS)

94. Plaintiff hereby reincorporates paragraphs 1 – 73 by reference.

95. On November 15, 2023, Defendants illegally arrested and searched Ms. Palmer.

96. MNPD has a lengthy, decades-long custom of race discrimination against African Americans in roadside searches and detentions.

97. On information and belief, the decision to arrest and search Ms. Palmer was motivated at least in part based on her race.

98. Defendants acted under color of state law in arresting Ms. Palmer and searching her person and property.

99. Defendant Metro is responsible for the illegal arrest and searches because of its systemic custom of tolerating documented race discrimination against African Americans in roadside searches and arrests, and for being deliberately indifferent to an MNPD culture that treats African Americans who are lawfully armed as a threat.

100.     The individual Defendants acted in blatant disregard for Ms. Palmer's constitutional rights, ignoring MNPD Overwatch's clear admonition given prior to the arrest that Ms. Palmer was innocent.

101.     Defendants' racially motivated illegal arrest and searches caused Ms. Palmer to suffer a deprivation of liberty, physical discomfort, and severe emotional harm.

12

## **REQUEST FOR RELIEF**

**WHEREFORE**, these premises considered, Plaintiffs pray:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for Plaintiff enter against the Defendants on each count.

4. That Plaintiff be awarded nominal, compensatory, and punitive damages against Defendants.

5. That Plaintiff be awarded attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

6. That the court costs in this matter be taxed to Defendants.

7. That Plaintiff be awarded all other relief to which it may appear she is entitled in the interests of justice.

Respectfully submitted,

*s/ Kyle Mothershead*
*s/ Aaron Rothbaum*
Kyle Mothershead, BPR 22953
Aaron Rothbaum, BPR 36572
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Brentwood, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: Kyle@relentlesslaw.com