**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SASHA PALMER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-01323** |
| | ) | **Judge Aleta A. Trauger** |
| **METROPOLITAN GOVERNMENT OF** | ) | |
| **NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY, TENNESSEE,** | ) | |
| **HOLLY GENUALDI, CHARLES** | ) | |
| **AGIUS; and MICHAEL SWONER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiff Sasha Palmer sues the Metropolitan Government of Nashville and Davidson County ("Metro") and three individual Metro Nashville Police Department ("MNPD") police officers—Holly Genualdi, Charles Agius, and Michael Swoner (collectively, the "officer defendants")—under 42 U.S.C. § 1983, for damages arising from an alleged false arrest that took place on November 15, 2023. Now before the court are four separate Motions to Dismiss the plaintiff's First Amended Complaint ("FAC") (Doc. No. 32)—one filed by each of the defendants (Doc. Nos. 40, 41, 43, 45). The plaintiff opposes each motion and, in addition, has filed a Motion to Amend Complaint (Doc. No. 59), along with a proposed Second Amended Complaint ("SAC") (Doc. No. 59-1).

As set forth herein, the four Motions to Dismiss will be granted, and the Motion to Amend will be denied as futile.

## I.     LEGAL STANDARD – RULE 12(B)(6)

According to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion to dismiss under Rule 12(b)(6). District courts may grant a motion under Rule 12(b)(6) only if a complaint does not state a "plausible" claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When evaluating the plausibility of a complaint, "courts must accept its factual allegations as true and draw 'all reasonable inferences in' the plaintiff's favor." *VCST Int'l B.V. v. BorgWarner Noblesville, LLC*, 142 F.4th 393, 399 (6th Cir. 2025) (quoting *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020)). District courts must also "restrict their review to the 'four corners' of the complaint and a limited set of other materials, such as documents that the complaint refers to and depends on." *Id.* (citing *Blackwell v. Nocerini*, 123 F.4th 479, 486–87 (6th Cir. 2024)); *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). This rule extends to the use of video evidence in § 1983 actions. *See Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (holding that courts may "consider[] videos at the motion-to-dismiss stage"). However, "[i]f there is a factual dispute between the parties, [the court] can only rely on the videos over the complaint to the degree the videos are clear and 'blatantly contradict[]' or 'utterly discredit[]' the plaintiff's version of events."

*Id.* (third and fourt alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024).[1]

Further, when a defendant relies on an affirmative defense to dismiss a complaint under Rule 12(b)(6), "the framework becomes more nuanced," because "[a] complaint need not plead factual allegations to plausibly avoid an affirmative defense." *Id.* (citations omitted).[2] Courts may grant a motion to dismiss based on an affirmative defense only "if the complaint's allegations (or any other documents that we may consider at this stage) show as a matter of law that the defense applies." *Id.* at 400.

## II. PROCEDURAL HISTORY

As noted above, the incident that provoked this lawsuit took place in November 2023. During this incident, Palmer, unfortunately, was mistakenly identified as having been involved in a car theft. She was arrested and placed in the back seat of a police cruiser, but the mistake was cleared up and she was released within ten minutes of having been initially detained, as described in greater detail below. The plaintiff initiated this lawsuit in November 2024 by filing a thirteen-page Complaint (Doc. No. 1), asserting claims against all defendants under § 1983 for false arrest and unlawful search in violation of the Fourth Amendment and race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. The claims against Metro were premised upon allegations of Metro's "systemic failure to discipline officers for conducting false

---

[1] *Scott* involved the treatment of videos in the context of a motion for summary judgment, while *Bell* and *Saalim* both concerned videos filed by the defendants in support of motions to dismiss. However, even where, as here, a video is filed by a plaintiff as an exhibit to the complaint, the Sixth Circuit has held that the court "need [not] accept as true any allegation [in the complaint] 'blatantly contradicted' by the video." *Brown v. Giles*, 95 F.4th 436, 440 (6th Cir. 2024) (citing *Scott*, 550 U.S. at 380). In other words, it appears that the standard is the same irrespective of which party files the videos.

[2] Qualified immunity is such an affirmative defense, and a plaintiff is not required to plead facts to refute it. *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 761 (6th Cir. 2020).

arrests and illegal searches, leading to a custom of impunity for these types of Fourth Amendment violations" and allegations of Metro's "lengthy history of discrimination against African Americans in roadside traffic related detentions and searches." (Doc. No. 1 ¶¶ 80, 90, and p. 8.)

Defendants Swoner and Genualdi filed Motions to Dismiss, to which the plaintiff responded by filing her FAC, which added seventeen pages of factual allegations and included a new claim that the officer defendants' continued retention of Palmer's handgun after all suspicions about her involvement in criminal activity had been dispelled violated her rights under the Second Amendment. Following the filing of the FAC, all four defendants filed the pending Motions to Dismiss. The plaintiff filed a Response to each of the four motions, and each defendant filed a separate Reply. (Doc. Nos. 49–52, 53, 56–58.) In addition, the plaintiff filed her Motion to Amend, along with a supporting Memorandum of Law. (Doc. Nos. 59, 60.) Metro filed a Response in Opposition,[3] and the plaintiff filed a Reply. (Doc. Nos. 63, 64.)

The proposed amendment to the pleading affects only the allegations and claims against Metro; even if granted, it would not moot the officer defendants' Motions to Dismiss. The court, therefore, will set forth the factual allegations concerning the officer defendants and address their Motions to Dismiss first, before turning to the plaintiff's Motion to Amend and Metro's Motion to Dismiss.

## III.    THE INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS

### A.    Facts

On November 15, 2023, plaintiff Sasha Palmer, an African American woman, was taking a walk during her break from work, carrying her handgun in her purse for protection. She had a

---

[3] Although the other defendants did not respond, Metro states that they join in its Response. (Doc. No. 63 at 1 n.1.)

permit to carry a handgun. (Doc. No. 32, FAC ¶¶ 13, 15, 17.) As she approached the intersection of Bell Road and Murfreesboro Road, she saw a truck "careening toward her at high speed." (*Id.* ¶ 18.) She ran to get out the way as the truck nearly hit her, and she watched as the truck crashed shortly thereafter. (*Id.* ¶¶ 19–20.) She also saw the driver of the truck, a young African American man, jump out of the truck and run away. (*Id.* ¶ 22.) At this point, she became aware of numerous MNPD cruisers approaching at high speed and an MNPD helicopter in the air. (*Id.* ¶ 23.) She was terrified, and she turned around to head home on foot. (*Id.* ¶ 25.)

As it turned out, the truck that almost struck Palmer had been reported stolen earlier that day, and the MNPD were already investigating. The person who reported the truck stolen was Hispanic, and there is some indication that a "language barrier" prevented police officers from fully understanding what the victim reported. (*Id.* ¶¶ 26–45.) The video from defendant Swoner's body worn camera ("BWC") clearly indicates that the reporting officer told Swoner that the victim "maybe saw two people get in [the truck]." (Doc. No. 39, Swoner BWC at 1:34.)[4] According to the plaintiff, the officer also related that the victim had tracked his truck to a dealership where he saw "two black <u>males</u> get out of his truck." (FAC ¶ 32.)[5] The victim also indicated that the man who stole the truck had a gun in his back waistband. (Swoner BWC at 2:40–45.) After speaking briefly with the victim, defendant Swoner, a White sergeant with the MNPD, decided to wait to see if "Air One," the MNPD's helicopter unit, could locate the truck. (FAC ¶ 46.)

---

[4] With the FAC, the plaintiff manually filed a flash drive that contains six videos of body camera and interior patrol car footage from the three officer defendants. (Doc. No. 39.) The court has reviewed the videos and finds that only the first three are useful: "Swoner BWC," "Genualdi BWC," and "Agius BWC 1." The court identifies herein any point at which it relies on the videos for clarification or finds them to blatantly contradict the FAC.

[5] The court, having listened to the video multiple times, finds that any reference to "two black males" is not at all clear but nonetheless, at this juncture, credits the plaintiff's interpretation of the video.

After Air One and several other police "units" on the ground located the truck and communicated its location over the radio, Swoner began driving to the location where the truck had last been seen. (*Id.* ¶ 61.) At one point, Swoner was following the truck and reported over the radio that "he could see the truck 'shaking,' which he interpreted to mean that the occupants inside were 'wiggling around quite a bit.'" (*Id.* ¶ 71.) Swoner attempted to pull the vehicle over on Bell Road, but when the truck sped up, he decided to "allow the truck to flee rather than engaging in a high speed pursuit." (*Id.* ¶ 77.) In addition to Swoner, other units, including Air One, were providing real time updates over the police radio about the truck. (*Id.* ¶ 79.)

Air One reported that the driver had stopped the truck and jumped out. Air One described the driver as a "male black, black hoodie, braid, jeans, white shirt, I mean white shoes, black/white shoes." (*Id.* ¶ 83; Doc. No. 39, Swoner BWC at 22:05–14.) Air One continued reporting where the driver was; Swoner, based on Air One's instructions, pulled into a parking lot close to where the suspect had abandoned the truck and began pursuing him on foot. (FAC ¶ 88.) The suspect eluded him, and Swoner returned to his patrol car. (*Id.* ¶ 89.)

Meanwhile, MNPD's "Overwatch" unit, tasked with monitoring surveillance cameras in the area, had also begun monitoring the situation. (*Id.* ¶ 90.) As it turned out, one of the Overwatch cameras recorded the truck's almost striking Palmer at the intersection of Bell Road and Murfreesboro Road. (*Id.* ¶ 91.) The Overwatch unit asked Air One over the radio, "Did you see a female bail out of the truck?" (*Id.* ¶ 92.) Air One responded, "No I did not. The driver bailed, I stuck with the driver." (*Id.* ¶ 93.) Swoner asked another officer to go to the truck; he did not mention that the owner of the truck had reported that he saw two male suspects in his truck. (*Id.* ¶¶ 94–95.)

Air One reported, "There's a female that's kind of running, uh . . . slightly heavier set, with a pink shirt, and kind an afro, she's, uh, running south on Murfreesboro, kind of away from the car. I didn't see her exit the car though." (*Id.* ¶ 97.) Overwatch reported, "We saw her run, didn't see her get out of the car, but she's been running . . . [unintelligible] . . . the car." (*Id.* ¶ 98.)

At this point, an unidentified White man driving a van pulled into the parking lot next to Swoner and told him, "Your suspect is a heavyset black female with an afro, she has a blue purse on her right now." (*Id.* ¶ 99.) While Swoner was talking to this witness, Air One and Overwatch continued to converse over the radio.[6] Air One reported that the female seemed "super interested in the truck" and asked Overwatch if they had anything on her. (*Id.* ¶ 100.) Swoner, around the same time, asked the White male witness which way the female he was referring to had gone, and the man told him she was headed toward Murfreesboro Road. (*Id.* ¶ 101.)

Swoner asked the man if she had "pinkish hair," and the man responded, "Yeah, she has a pink [unintelligible] on [unintelligible]," and he confirmed that he saw her get out of the truck. (Swoner BWC at 26:18–25.) At the exact same time that this conversation was occurring, however, Overwatch stated over the radio, "The female is not involved. We played back the camera. The vehicle almost struck her." (*Id.* at 26:23–25; FAC ¶ 104.) It is unclear from the video whether Swoner heard this statement, because he was talking to the witness at the same time. While Swoner was asking the witness for identification and began taking that information from him, Air One asked over the radio if anyone wanted to interview the female as a "potential victim." (FAC ¶¶ 105–06; Swoner BWC at 26:29–26:32.) Immediately thereafter, Swoner stated over the radio, "Hey 30 [identifying himself], yeah, detain her. She came out of the truck. I've got a witness telling

---

[6] At this point, Swoner's body camera video is extremely confusing to listen to, as Swoner and the witness are conversing while Overwatch and Air One continue to broadcast over the radio.

me." (FAC ¶ 107; Swoner BWC at 26:34–37.) Air One then reported the location of the female. (FAC ¶ 108.)

Swoner asked the witness if the female came out of the driver's side or the passenger's side of the truck, and the witness admitted that he "didn't see, honestly." (*Id.* ¶¶ 112–13.) Swoner asked, "Can you tell me her description again?" The witness responded, "Heavy set black female with an afro, pink sweater, blue purse," and he confirmed that her hair was black. (Swoner BWC at 27:37–45.) The witness also described what he had seen: "And, uh, so she come running down this way, and then once you guys pulled in in front of her in the parking lot, she did a 180 and took off down Murfreesboro. And none of the businesses would let her in, in the strip mall right here, so she just kept walking." (*Id.* 27:46–56; *see also* FAC ¶ 114.)

After thanking the witness, Swoner returned to his patrol car and drove the short distance back to where the suspect had crashed the stolen truck. MNPD Officer Cato, a Black male police officer, was with the truck. (FAC ¶ 118.) While Swoner began searching the truck, Cato told Swoner that "Holly"—referring to defendant Genualdi (White female)–and "95"—meaning defendant Agius (White male)—were detaining the female suspect. (*Id.* ¶ 121.) Cato asked Swoner, "So did she get *out* of the truck?" and Swoner replied affirmatively. (*Id.* ¶¶ 122–23.) A White police officer who had by then arrived at the scene also asked, "So she was in it?" and Swoner again responded that she was. (*Id.* ¶¶ 124–25.) Cato then said, "Because I thought someone said she wasn't." (*Id.* ¶ 126.) Swoner responded, "The helicopter said he didn't see her get out of it, he was watching the driver. But I had another witness pull up and sa[y], 'Yeah your female is running that way.'" (*Id.* ¶ 127.) The White officer said, "Well Overwatch said she was just out running around," and Cato replied, "Yeah that's what I thought." (*Id.* ¶¶ 129–30.) Swoner said:

"Well it looked like they were fighting in the truck, coming down the road. Because they got to driving all crazy." (*Id.* ¶ 131.)

Meanwhile, Officer Genualdi had pulled up and parked by the stolen truck around the time that Swoner gave the order to detain the female. (*Id.* ¶ 133.) Genualdi heard the order, responded "All right," and immediately drove toward where Palmer was reported to be, saying over the radio, "Show me out with a possible victim or a suspect, the woman wearing a pink shirt, black afro." (*Id.* ¶¶ 134–35; Genualdi BWC at 1:20-2:07.)

Genualdi, blue lights on, stopped her cruiser in the middle turning lane of Murfreesboro Road across from where Palmer was walking on the sidewalk and looking at her cell phone. (FAC ¶¶ 136–37.) She asked Palmer, "Were you inside the car by any chance?" (*Id.* ¶ 137.) Palmer responded, "Huh?" (*Id.* ¶ 138.) Genualdi told her to "hold on one second," while she crossed the road, approached Palmer, and asked her to hold her hands up. (*Id.* ¶¶ 139–40.) Palmer complied, still holding her phone, and then Genualdi told her to put her hands behind her back, telling her, "We're detaining you right now because you were close to the scene. OK?" (*Id.* ¶¶ 141–44.) Genualdi proceeded to handcuff Palmer, while Palmer began protesting that she "didn't know him" and asking why she was being detained. (*Id.* ¶¶ 145–46.) She stated that she "didn't do anything" and that "[h]e almost hit [her]." (*Id.* ¶¶ 148, 150.) Genualdi, while continuing to secure the handcuffs, assured Palmer "[w]e're going to explain everything to you." (*Id.* ¶ 149.) Genualdi reported on the radio that she had detained the "female." (*Id.* ¶ 155.)

Genualdi then walked Palmer across the street to her patrol car, put her purse on the trunk of the car, patted her down, took her phone, and placed her in the backseat of the patrol car. (*Id.* ¶¶ 156–62.) Palmer was obviously and vocally upset at this turn of events, and she repeatedly

asked why she was being arrested. (*Id.* ¶¶ 146, 148, 150–51, 154.) As Genualdi was placing Palmer in the back of her car, Agius arrived. (*Id.* ¶ 163.)

While Genualdi was palpating Palmer's purse to determine whether it contained a weapon, Agius told her, "You can open this. She was in the vehicle." (FAC ¶ 166; Agius BWC 1 at 2:16–18.)[7] They then searched the plaintiff's purse, where they discovered a small handgun, which they reported over the radio. (FAC ¶ 172; Swoner BWC at 32:15.) From inside the car, Palmer continued to protest being detained, stating repeatedly that she did not consent to the search of her purse. (FAC ¶¶ 171–72.) Agius and Palmer placed the weapon and the magazine in MNPD evidence bags. (*Id.* ¶ 175.) Genualdi stated that she would run the firearm through the MNPD's computer system, while Agius ran Palmer's identification. (*Id.* ¶ 176.)

While Genualdi and Agius were involved in detaining Palmer, Swoner was still conducting a search of the stolen truck a short distance away. Beginning at approximately 32:38 on the Swoner body cam video, or six minutes after he issued the order to detain "the female," Overwatch again alerted Swoner and the other officers responding to the incident that the "female in the pink top is not involved in this, she was almost run over by the vehicle as it ran through the intersection." (*Id.* ¶ 177; Swoner BCW at 32:38–46.) Swoner's body cam video reflects the following exchange:

> Swoner: Is that the female with the 54 [gun] that we got?
>
> Overwatch: I don't know if she had a 54 or not, but she was a pedestrian on the sidewalk when that vehicle ran through the intersection and almost hit her.

---

[7] The FAC and the video are contradictory on this point. The FAC alleges that Agius said, "You can open it up because she's in the vehicle." (FAC ¶ 167.) In fact, the video shows that Agius said "She was in the vehicle," clearly referring to the plaintiff as having been in the stolen truck. The plaintiff "acknowledges that it is possible that a jury could credit" this "interpretation" (also proffered by Agius) over the "interpretation" in the FAC but contends that "this kind of disagreement hardly 'blatantly contradicts' the FAC" and, in any event, is "not particularly material." (Doc. No. 51 at 3.)

Swoner: Alright, I'll see if it's the same one. I've got another witness that pulled up out here that said she came out of the truck.

Overwatch: Uh, negative. We'll play back the footage again, but she was a pedestrian. But we'll double check.

Swoner: Yeah, watch it again for me, 'cause this guy was adamant and gave a very good description of her.

(Swoner BCW at 32:49–33:25.)

While waiting to hear back from Overwatch, Swoner stated, "I'm gonna go up there and see what they got." (*Id.* at 33:35–37.) As he started to walk back to his vehicle, Air One came on the radio and said, "Air One. Just to reiterate. We didn't see her come out of the truck. We just saw her leave the scene there. We're curious if you guys wanted to talk to her about being a victim." (*Id.* at 33:39–50.) Genualdi stated, "10-4, you said she did not come out of the truck [unintelligible], right?" Air One clarified: "Did not see her come out of the truck, but I didn't see her when the driver bailed. I was focused on the driver, so, didn't really pay attention to the surroundings there." (*Id.* at 33:57–34:06; Genualdi BCW at 8:36–52.)

Immediately after that statement, Overwatch came on the radio and stated unequivocally, "We have verified she was a pedestrian on the sidewalk who did not exit the vehicle. She was nearly struck by the vehicle when it ran across the intersection." (Swoner BCW at 34:09–17; Genualdi BWC at 8:53–9:01.) Swoner, at that point, was already in his car and driving the short distance to where Agius and Genualdi had detained Palmer. He continued to drive toward where Palmer was being detained. He came on the radio at 34:55 of his body cam video to state that he was "going up there where they've got her detained, see about that description." (Swoner BCW at 34:55–59.) He drove approximately ten more seconds and stopped his vehicle at 35:09, walked up to Genualdi's vehicle, and opened the rear door to begin speaking to Palmer at 35:37.

Agius' body cam video also shows that, shortly after he and Genualdi had placed Palmer's hand gun and ammunition in evidence bags, placed the evidence bags in the front seat of Genualdi's car, and announced that the female they had detained had a "54," they heard Overwatch state that "the female in the pink top is not involved in this, she was almost run over by the vehicle as it ran through the intersection." (FAC ¶ 177; Agius BWC 1 at 5:02–10.) Agius and Genualdi paused in what they were doing and looked at each other. (FAC ¶ 178.) Agius opened the door to speak to Palmer, who was still very upset and repeating that she was not involved. He told her, "We were given this information right now.[8] Somebody else told us that you got out of the truck. We have somebody else on our radio, in our ear right now, saying that you were almost hit by the truck." (Agius BWC 1 at 5:35–47.) He tried to explain to Palmer, who continued to yell over him, that the information they had been given was apparently wrong and that they were trying to verify that "right now." (Agius BWC 1 at 5:47–7:18.) He acknowledged that a mistake had been made, apologized to her ("I'm sorry this is happening to you."), and told her that their sergeant was "coming up right now" and would "get all this figured out." (*Id.* at 6:15–7:41.)

Palmer asked him to "please close the door," which he did. (*Id.* at 7:49–55.) Within five seconds of Agius' closing the door, Swoner arrived on the scene and was approaching Genualdi's vehicle on foot. (*Id.* at 8:00.) Swoner arrived approximately ninety seconds after Overwatch had reconfirmed that Palmer had not come out of the stolen truck. (FAC ¶ 199.) Swoner let Palmer out of the car, removed the handcuffs, explained to her what had happened and why they had stopped her, and apologized. (*Id.* ¶¶ 200, 203–04.)

---

[8] This is different from what the FAC says. According to the FAC, Agius told her they were "given misinformation." (FAC ¶ 183.) Based on context and the remainder of Agius' statement, the court finds that the video blatantly contradicts the FAC. This contradiction is not material, however.

Swoner asked Palmer where she was headed, and she explained that she was on her break from work and lived nearby so would just go home now, "down the street." (Swonder BWC at 38:02–11.) He offered her a ride home, which she accepted, stating that she was "a little embarrassed now." (FAC ¶ 206; Swoner BWC at 38:11–15.) Agius volunteered to drive her, and Palmer got in the back seat of his police cruiser. (FAC ¶ 217.) Before they left, Swoner gave Palmer his card and apologized. (*Id.* ¶ 228.)

An MNPD counselor was in the front passenger seat of Agius' vehicle and offered to talk with Palmer about the incident (since she was now considered a victim). (Agius BWC 1 at 12:35.) Palmer replied that she did not. (*Id.* at 12:38.) Although Palmer had retrieved her purse and wallet from Genualdi before getting into Agius's car (*see* Agius BWC 1 at 10:45), Agius retained Palmer's firearm until they reached her house and she exited the vehicle (FAC ¶¶ 232, 238). Four minutes and fourteen seconds passed from the time Genualdi gave Palmer her purse and Agius gave her back her gun. (Agius BWC 1 at 10:45–14:59.) While they were driving, Palmer asked about her firearm, and Agius confirmed that he had it and would give it to her once they dropped her off. (FAC ¶¶ 233–34; Agius BWC 1 at 12:55–13:00.) The counselor explained to her that they could not let her be "in the back of the car with it, that's all." (Agius BWC 1 at 13:01–03.)

Palmer, who had never been arrested before, was "extremely traumatized" by the entire incident. (FAC ¶¶ 223, 239.) She was also embarrassed because she works and lives in the area where the incident took place, as she made clear when talking with Agius. (Agius BWC 1 at 7:40–45.)

**B.     The Individual Defendants' Motions to Dismiss**

*1.     False Arrest*

*a)     Legal Standards*

The Fourth Amendment guarantees the right "to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "Its protections apply both to 'traditional arrest[s]' and to 'investigatory stops,' sometimes called *Terry* stops, that fall short of arrest." *Harrod v. Lee*, No. 24-5228, 2024 WL 5103834, at *2 (6th Cir. Dec. 13, 2024) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002); and citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).

"For a *Terry* stop, an officer must have a 'reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity.'" *Id.* at *3 (quoting *United States v. Williams*, 615 F.3d 657, 666 (6th Cir. 2010)). "That suspicion must be based on specific, objective facts," and, in evaluating whether an officer had reasonable suspicion, the court "must consider the totality of the circumstances rather than analyze each fact in isolation." *Williams*, 615 F.3d at 666 (citations and internal quotation marks omitted).

What begins as an investigatory seizure may become an arrest. "When police actions go beyond checking out the suspicious circumstances that led to the original [*Terry*] stop, the detention becomes an arrest that must be supported by probable cause." *Smoak v. Hall*, 460 F.3d 768, 780–81 (6th Cir. 2006) (quoting *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994)). "Although the use of guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest, these displays of force must be warranted by the circumstances." *Id.*

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The existence of probable cause depends on "the

reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* An officer has probable cause when he has "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (ellipsis in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The account of an eyewitness "will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (citation omitted). When the facts are undisputed, "the ultimate question of probable cause . . . in a civil case . . . is a question of law for the court." *Lester v. Roberts*, 986 F.3d 599, 612 (6th Cir. 2021) (quoting *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020)).

The officer defendants in this case, besides asserting that they did not violate the plaintiff's constitutional rights, assert the affirmative defense of qualified immunity. "Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024) (quoting *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016)). "[T]o determine whether an official is entitled to qualified immunity," the court must apply "a two-prong test." *Burnett v. Griffith*, 33 F.4th 907, 911 (6th Cir. 2022). Under the first prong, the court asks "whether the facts, 'taken in the light most favorable to the party asserting the injury, . . . show that the officer's conduct violated a constitutional right.'" *Id.* (quoting *Jones v. Clark Cnty.*, 959 F.3d 748, 766 (6th Cir. 2020), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022)). The second prong requires determination of whether the right was "clearly established at

the time of the alleged violation." *Bambach v. Moegle*, 92 F.4th 615, 623 (6th Cir. 2024). However, because "there is no 'rigid order of battle,'" the court may consider these questions in any order and "may resolve a qualified immunity defense under" either prong. *Cunningham v. Blackwell*, 41 F.4th 530, 536 (6th Cir. 2022) (citing *Pearson v. Callahan*, 555 U.S. 223, 234 (2009)).

Because qualified immunity is a defense to suit rather than liability, the Supreme Court has 'stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Hodges v. City of Grand Rapids*, 139 F.4th 495, 504 (6th Cir. 2025) (quoting *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019)). This point "is usually summary judgment and not dismissal under Rule 12." *Id.* (citation omitted). However, qualified immunity is "resolvable at the motion-to-dismiss stage 'when the complaint establishes the defense.'" *Id.* at 505 (quoting *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020)); *see also Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021) (confirming that dismissal on "affirmative defenses, like qualified immunity," is appropriate where the "validity of such defenses may be apparent from the face of the complaint").

### b) *False Arrest Claim Against Swoner*

Palmer's false arrest claim against Swoner is premised on his issuing the order to detain her and his failure to retract that order when he obtained additional information indicating that she was not involved in the truck theft. (FAC ¶¶ 104–05 (alleging that Swoner "ignored Overwatch's admonition" that the "female [was] not involved"), 115 (alleging that Swoner "left his order in place" after the eyewitness "admitted that he had not actually seen the woman get out of the truck"), 285 ("Sgt. Swoner caused these illegal searches and seizures by giving the order to detain Ms. Palmer.").)

Swoner argues that the SAC does not allege that he ordered that Palmer be *arrested*; instead, it alleges that he ordered that she be *detained*. He asserts that the plaintiff's allegations

and his body cam video clearly show that he had, at a minimum, reasonable suspicion to order the detention of Palmer, if not probable cause. He further argues that he was not present while the other officers detained Palmer, that he cannot be held liable for their actions, and that the plaintiff does not allege any facts showing that he "'implicitly authorized, approved or knowingly acquiesced in [any] unconstitutional conduct of [a] subordinate[,]' as is required for supervisor liability under Section 1983." (Doc. No. 40-1 at 11 (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).) Regarding the plaintiff's allegation that Swoner should have retracted his "detain" order after the eyewitness "admitted that he had not actually seen the woman get out of the truck" (FAC ¶ 115), Swoner argues that the witness's statement did not completely dispel the reasonable suspicion necessary to detain her. (Doc. No. 40-1 at 12.)

Second, Swoner argues that the plaintiff fails to plead facts sufficient to show that an arrest, as opposed to a *Terry* stop, actually occurred and that, even if it did, the eye witness's statement that Palmer had exited the stolen vehicle, combined with Swoner's reasonable belief that there had been two people in the vehicle and Air One's consistent description of an individual running from the scene, provided probable cause for an arrest. (Doc. No. 40-1 at 13–14.)

Finally, Swoner argues that, even if the court finds that the plaintiff has stated a colorable claim for a violation of her Fourth Amendment rights, he is entitled to qualified immunity, because it was not clearly established as of November 15, 2023 that, "when an eyewitness provides a detailed description of an individual involved in a criminal incident consistent with the description of an individual an overhead helicopter observed near the incident scene, where there is some conflicting information provided by MNPD units regarding the individual's involvement, detaining an individual that matched the description of the eyewitness for a brief period to investigate further could subject an officer to Section 1983 liability." (*Id.* at 16–17.)

The plaintiff responds that the facts of the case as alleged in the FAC establish that Swoner's detention order was unreasonable and not supported by reasonable suspicion as of the time it was given, because, (1) the original reporting officer told Swoner that the victim of the stolen truck had seen two *men* get out of the truck; (2) Air One saw only one person get out of the truck; (3) just before Swoner issued his detention order, Overwatch specifically stated over the radio, "The female is not involved. We played back the camera. The vehicle almost struck her" (FAC ¶ 104) and asked if anyone wanted to "interview her as a potential victim" (*id.* ¶ 106); and (4) although the eyewitness reported that he had seen the Black female in the pink top get out of the truck, he subsequently admitted he did not see whether she got out of the passenger's side or the driver's side. (Doc. No. 49 at 4.) Based on these same facts, the plaintiff asserts that "this [is] the 'rare obvious case' in which even a brief investigatory detention based on this thoroughly contradicted and impeached claim would violate the Fourth Amendment." (*Id.* at 5 (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019)).)

Viewing the facts in the light most favorable to the plaintiff, the court finds that Swoner had, at a minimum, reasonable suspicion to order the detention of Palmer pending further investigation. He had an eyewitness tell him he saw her get out of the truck, though he was not sure of which side. The witness provided a detailed description of Palmer and her activities just after he spotted her apparently running away from the truck, and his description matched the description of a woman running away from the truck provided by Air One and Overwatch. He provided his identification, and Swoner had no reason to doubt his "adamant" account. In addition, the record makes it clear that Swoner, from tailing the truck, believed that there was more than one

occupant in the truck. (FAC ¶ 71.)[9] Thus, even crediting the plaintiff's assertion that Swoner must have heard Overwatch the first time he stated over the radio that "[t]he female is not involved,"[10] that statement, at least until it was verified, was not sufficient to completely dispel Swoner's reasonable suspicion based on the other circumstances. In other words, it was still reasonable at that point to detain the "female" to question her, at least until he had further verification of what the video on which Overwatch was relying actually showed.

Citing *Florida v. J.L.*, 529 U.S. 266, 272 (2000), the plaintiff argues that the White bystander's tip needed to have "sufficient indicia of reliability" to provide reasonable suspicion. (Doc. No. 49 at 5.) But *J.L.* involved a tip received "from an unknown location by an unknown caller." *J.L.*, 529 U.S. at 571. Here, the bystander was on the scene, willingly provided his license and contact information to Swoner, provided a very detailed (and accurate) physical description of Palmer, and described where she had run. His claim that he saw her exit the truck was not, of course, accurate, but his tip had sufficient indicia of reliability to justify Swoner's decision to credit it over Overwatch's somewhat vague statement that "the female was not involved."

Palmer next faults Swoner for failing to promptly take action to confirm or dispel that suspicion. Instead of either following up with Genualdi to find out what she had learned from Palmer or asking Overwatch to repeat or confirm what it had just said, he instead searched the

---

[9] The plaintiff emphasizes that the owner of the truck reported seeing two "males" getting out of his truck at some point (FAC ¶¶ 32, 95), but she does not explain why Swoner should have presumed that that information was reliable, particularly considering the language barrier and that it came second hand from the officer taking the report. As it turned out, of course, it was not reliable—the vehicle had only one occupant at the time it crashed.

[10] The Swoner body cam video strongly suggests he did not hear this statement. As set forth above, he was talking to the eyewitness at the same time it was broadcast. (Swoner BWC at 26:18–37.) Although Cato and the other police officer both relayed to him that they had heard Overwatch say the female in the pink top was not involved, Swoner's response to them further substantiates the conclusion that he did not hear it. (FAC ¶¶ 122–31.) Regardless, for purposes of Swoner's Motion to Dismiss, the court presumes that he heard it.

stolen truck. The plaintiff, however, does not explain why Swoner was not justified in allowing (and expecting) Genualdi and Agius to do their jobs, while he did his. The court finds that, up until this point at least, the plaintiff fails to allege facts showing that Swoner violated her Fourth Amendment rights. He had simply directed the detention of a person he reasonably suspected of having jumped out of the stolen truck. Because the plaintiff cannot meet the first part of the qualified immunity test in connection with Swoner's actions up until this point (violation of a constitutional right), he is entitled to qualified immunity for issuing the order to detain Palmer, as the "female in the pink top" seen running from the scene of a crashed stolen truck.

The plaintiff also argues that, even if Swoner is entitled to qualified immunity for his actions up until "Overwatch's second clear admonition that Ms. Palmer was innocent," he is not entitled to qualified immunity after that point, because, having confirmed that she was innocent, he was "obviously obligated to immediately release her." (Doc. No. 49 at 14.) The plaintiff takes issue with the fact that Swoner did not immediately get on his radio and order her release and instead let her sit in the back of Palmer's patrol car for another ninety seconds before he arrived on the scene and personally released her. According to the plaintiff, there is "no possible justification for this final period of arrest." (*Id.*)

In *Smoak v. Hall*, the Sixth Circuit was "faced with the question of whether the approximately nine minutes that the [the plaintiffs] spent in handcuffs" after the officers who detained them had learned new information that dispelled any reasonable suspicion was "enough to deny the troopers qualified immunity." 460 F.3d at 782. Even at the time, the law was clear that, "[o]nce the purposes of the initial traffic stop [are] completed, there is no doubt that the officer [can] not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the reasonable suspicion to justify a further detention." *Id.* (citation omitted).

The Sixth Circuit found that, because the detention was no longer reasonable after such reasonable suspicion had evaporated, the traffic stop "morphed into an arrest." *Id.* At the same time, however, the police officers

> were still in the process of sorting out the disconnect between why they had pulled over the [plaintiffs] in the first place and the new information received from the dispatchers. The [plaintiffs] were also justifiably agitated and upset over the loss of their dog [which the officers had shot], and the troopers wanted to diffuse the situation. In this confusing factual scenario, we believe that the few extra minutes that the troopers took to release the [plaintiffs] was not so unreasonable as to deny them the protection of qualified immunity.

*Id.*

So, too, here, the plaintiff cannot establish that the additional ninety seconds she spent under arrest was so unreasonable that Swoner should be deprived of qualified immunity. In this case, in fact, the entirety of Palmer's detention lasted no more than nine minutes.[11] After Swoner issued the order to detain Palmer, Overwatch followed up six minutes later to repeat that the "female in the pink top is not involved in this." (Swoner BWC at 32:38.) Swoner asked Overwatch to double check, because he had a witness who was "adamant" that she had come out of the truck and "gave a very good description of her." (*Id.* at 32:49–33:25.) Even before Overwatch came back on the radio after reviewing the surveillance video again, Swoner was on his way to where Agius and Genualdi were detaining Palmer—a very short distance away. When he arrived on the scene, Palmer was still vocally (and understandably) very upset, and Swoner attempted to explain to her what had caused the confusion.

---

[11] Genualdi heard Swoner issue the order to detain Palmer at 1:18–22 on the Genualdi body came video. She had stopped Palmer on the sidewalk and directed her to put her hands behind her back within just over a minute of receiving that directive. (Genualdi BWC at 2:30.) Approximately five minutes after detaining or arresting Palmer, Genualdi overheard Overwatch repeat (the first time) that the "female in the pink top was not involved." (*Id.* at 7:22–30.) Swoner arrived and removed Palmer's handcuffs four minutes later. (*Id.* at 11:25.)

Under these circumstances, the court finds that Swoner is entitled to qualified immunity for the ninety seconds between the confirmation of Palmer's innocence and her release from handcuffs. By the time he received confirmation, he was already on his way to where Palmer was being detained, and, again, she was a very short distance away. He clearly had an interest in explaining the confusion to her and attempting to diffuse the situation. Based on *Smoak*, the court cannot find that the continued detention of the plaintiff for the brief period of time it took for Swoner to reach her was "so unreasonable as to deny [him] the protection of qualified immunity." *Smoak*, 62 F.3d at 162.

### c) *False Arrest Claim Against Genualdi*

For purposes of her Motion to Dismiss, Genualdi concedes that an arrest occurred. (Doc. No. 45-1 at 7.) The court, therefore, has no reason to analyze that issue. Genualdi characterizes this case as one of "misinformation." (*Id.* at 2.) More specifically, she maintains that, after she "heard her superior officer state that he had a witness who saw Plaintiff come out of the truck," she "executed her superior's order to detain and/or arrest the Plaintiff, thereby acting upon her superior officer's credible instruction supporting her reasonable belief of probable cause." (*Id.* (citing FAC ¶¶ 133–45; *Hall v. Navarre*, 118 F. 4th 749 (6th Cir. 2024)).) She argues that, because she had probable cause to effect an arrest, Palmer's Fourth Amendment claim fails as a matter of law. She also relies on the "collective-knowledge doctrine" to assert that she reasonably relied on Swoner's directive to detain Palmer based on his statement that he had an eyewitness who had seen Palmer exit the truck. (*Id.* at 8 (citing *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015), for the proposition that the collective-knowledge doctrine permits an officer to "conduct a stop based on information obtained from fellow officers").)

The plaintiff argues in response that "[p]rior case law made clear that Genualdi lacked probable cause." (Doc. No. 50 at 3.) She asserts that Genualdi, "like everyone else on the MNPD

team, . . . would have heard Air One . . . say they saw only one person exit the truck" and "would have heard Overwatch . . . state before Swoner's 'detain her order' that, 'The female is not involved. We played back the camera. The vehicle almost struck her.'" (*Id.* (citing FAC ¶¶ 79–88, 104.) She also cites Genualdi's body cam video, showing her tell Cato, just before she responded to Swoner's "detain her order," that she had seen Palmer on the sidewalk but, at that time, "had no reason to stop her." (*Id.* (citing Genualdi BWC at 1:00 *et seq.*).) Cato confirmed, "They say they didn't see her get out." (*Id.*) At that point, just prior to Swoner's "detain her order," Air One asked if anyone wanted to interview the woman as a "potential victim," but Genualdi "[n]evertheless" complied "when Swoner ordered his team to 'Detain her.'" (*Id.*)

In fact, the FAC does *not* allege that Genualdi heard Overwatch state (the first time) that the "female [wa]s not involved." (*See* FAC ¶¶ 133–35.) Nor could the plaintiff have plausibly alleged that she did. The court has reviewed the Genualdi body cam video, the sound for which does not start until approximately one minute and four seconds after the video starts. At that moment, Genualdi had pulled up near where Cato was parked and was saying something to Cato. When the audio kicks on, Cato was saying, ". . . see her get . . ." while shaking his head. (Genualdi BWC at 1:04–06.) Construing that statement in the light most favorable to the plaintiff, the court presumes that he was telling Genualdi that Air One had said they did not see the woman in the pink top get out of the stolen truck. At the same time that Overwatch was talking on the radio in the background, Genualdi responded to Cato, saying "Okay, so there was a girl that just walked that way, wearing a pink shirt, but we had no reason to stop her, hunh?" (*Id.* 1:05–12.) It appears based on the totality of the record that it was at the moment during which Genualdi was speaking to Cato that Overwatch stated, for the first time, that the woman in the pink top was "not involved," but the video makes it clear that Genualdi did not hear the statement. (It is also unintelligible on

the video.) While Air One proceeded to say something over the radio in the background, Cato was again telling Genualdi, "They say they didn't see her get out." After he stopped talking and was walking away, Overwatch (or Air One) can be heard asking "anyone want to interview her as a potential victim?" (*Id.* at 1:13–16.)

While the video indicates that Genualdi did not hear Overwatch state that the female was "not involved," because she was talking to Cato, she obviously did hear Swoner state, "Hey 30, yeah, detain her. She came out of the truck. I've got a witness telling me." (*Id.* at 1:18 –23.) At that point, Genualdi knew that Swoner was telling her that an eyewitness had seen the woman in the pink top get out of the truck, and, based on her conversation with Cato, she had heard the prior radio talk from both Air One and Overwatch about seeing a woman in a pink top running away from the intersection where the truck had crashed and stopped, even though, as Cato said, they had not actually seen the woman get out of the truck.

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. "Generally, probable cause exists when the police have 'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Gardenhire*, 205 F.3d at 315 (alteration in original) (quoting *Beck*, 379 U.S. at 91). "[A]n officer is required to 'consider the totality of the circumstances,' and cannot look only at the evidence of guilt while ignoring all exculpatory evidence when assessing probable cause." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Gardenhire*, 205 F.3d at 318).

When this incident occurred, it was clearly established that the account of an eyewitness "will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent

reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers*, 188 F.3d at 370; *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 521–22 (6th Cir. 2016) ("Probable cause is created only by eyewitness allegations that are reasonably trustworthy, and thus probable cause does not exist where there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection."). In this case, Palmer's protestations to the contrary notwithstanding, there was no apparent reason for Genualdi or Swoner to believe that the eyewitness was lying or mistaken. Genualdi had heard Air One and Overwatch state that they had seen a woman running from the scene, though they had not actually seen her get out of the vehicle. She did not hear Overwatch state (the first time) that the woman did *not* get out of the vehicle. And she heard from Swoner that an eyewitness had seen her get out of the vehicle. The plaintiff does not argue that seeing an individual fleeing from a stolen vehicle would *not* be sufficient to give rise to probable cause to believe that the individual was involved in the theft. Instead, she argues that Genualdi "ignore[d] evidence that would have negated probable cause" and that it should have been "crystal clear to any reasonable officer in Genualdi's position that . . . the 'witness' Swoner was relying on was, at a minimum, 'in some fashion mistaken.'" (Doc. No. 50 at 8 (quoting *Courtwright*, 839 F.3d at 521).) She points to Genualdi's after-the-fact conversation with Cato, in which Cato said, "They kept saying [Ms. Palmer] wasn't [in the truck,]" to which Genualdi responded, "Yeah, and then, I think there was one person that said, 'do stop her' so I was like, 'whatever.'" (*Id.* (quoting FAC ¶¶ 243–44).)[12]

---

[12] The body cam video of this purported encounter is not in the record.

Genualdi's after-the-fact confusion is not indicative of what she knew at the time she effected the arrest, and the record, even viewed in the light most favorable to the plaintiff, does not establish that Genualdi heard Overwatch the first time it stated that the woman in pink was "not involved." The court finds, in short, that Genualdi had probable cause to arrest Palmer and therefore did not violate her Fourth Amendment rights.

Moreover, even if the court accepts for purposes of the Motion to Dismiss that Genualdi lacked probable cause to effect the arrest, she is still entitled to qualified immunity unless the "unlawfulness of this arrest was clearly established" as of November 2023. *Jones v. Naert*, 121 F.4th 558, 567 (6th Cir. 2024), *reh'g denied*, No. 23-1056, 2024 WL 5398777 (6th Cir. Dec. 11, 2024). As the Sixth Circuit has explained, "[a] right is clearly established if its contours are definite enough 'that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* (quoting *Ouza*, 969 F.3d at 275). That means, in the probable cause context, that the plaintiff must either "identify a case where an officer 'acting under similar circumstances' was deemed to have violated the Fourth Amendment" or "show that her claim presents one of those 'rare 'obvious case[s]' where no existing precedent is needed." *Id.* at 568 (quoting *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (citation omitted)). The plaintiff has not pointed to any similar cases that would have put Genualdi on notice that she was violating Palmer's Fourth Amendment rights and, with respect to Genualdi at least, Palmer does not argue that the violation was so obvious that no existing precedent was needed.

Moreover, the Sixth Circuit recognizes that a police officer may be entitled to qualified immunity in situations where "'reasonable officers' could conclude that they have probable cause for an arrest based on 'plausible instructions' from a supervisor when 'viewed objectively' in light of their own knowledge of the surrounding facts and circumstances." *Gray v. Shelby Cnty.*, No.

22-5542, 2023 WL 5237373, at *6 (6th Cir. Aug. 15, 2023) (quoting *Bunkley v. City of Detroit*, 902 F.3d 552, 562 (6th Cir. 2018)). In this case, Swoner's instructions combined with Genualdi's knowledge that Air One and Overwatch had both seen the woman running away from the site of the accident (even though they had not actually seen the woman exit the truck) were sufficient to permit a reasonable officer to conclude that she had probable cause. Genualdi, therefore, is entitled to qualified immunity for arresting the plaintiff.

Palmer also argues that, at a minimum, Genualdi violated her Fourth Amendment rights by continuing to detain her even after Overwatch had confirmed a second and then a third time that the woman in the pink shirt was not involved in the truck theft. For the same reasons as set forth above in connection with Swoner's motion, the court finds that Genualdi's decision not to immediately release the plaintiff, instead waiting the less than two minutes it took for Swoner to arrive and release her, is not sufficient to deprive her of qualified immunity.

        *d)*       *False Arrest Claim Against Agius*

In support of his Motion to Dismiss, Agius argues that he cannot be liable for false arrest because, as alleged in the FAC and as shown in the videos attached thereto, he did not participate in the alleged false arrest—he did not effect the initial detention, did not apply handcuffs, did not perform the pat-down search, and did not place Palmer in the police cruiser. (Doc. No. 42 at 7.) Indeed, as alleged in the FAC, he arrived on the scene just as Genualdi had installed Palmer in her vehicle and was closing the door. (FAC ¶¶ 162–64.) Agius also argues that, if he is considered to have been involved in the arrest, he was entitled to rely on the information in the other officers' possession establishing probable cause. (Doc. No. 42 at 9.) The plaintiff responds that "Agius was on the radio, like everyone else on the MNPD team," and that he "unlawfully help[ed] Genualdi keep Ms. Palmer under arrest." (Doc. No. 51 at 4, 6.)

The FAC, however, does not contain any allegations about what Agius heard on the radio prior to his arrival on the scene, at which point Genualdi had already detained Palmer. Nor does the body cam video establish what he heard or knew. Regardless, Agius was not present for or involved in the plaintiff's arrest and cannot be liable therefore, and the FAC contains no allegations indicating he affirmatively knew or should have known that Genualdi lacked probable cause for the arrest. The FAC fails to establish that Agius violated the plaintiff's Fourth Amendment rights by effecting an unreasonable seizure or arrest.

Insofar as the plaintiff argues, again, that Agius had an obligation to immediately release the plaintiff as soon as Overwatch admonished, for the second time, that the "female in the pink top was not involved" and instead had almost been "run over by the vehicle as it ran through the intersection," the court finds that Agius is entitled to sovereign immunity. Upon hearing the second admonition, which apparently conflicted with the eyewitness statement, Agius was entitled to receive additional clarification before proceeding, as he tried to explain to Palmer. And, for the same reasons as set forth above, the fact that he waited less than two minutes for Swoner to arrive, after hearing Overwatch's final confirmation that the plaintiff was innocent, rather than releasing her immediately, is not sufficient to warrant depriving him of qualified immunity.

    2.    *Unlawful Search*

    a)    *Legal Standards*

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (same, quoting *Arizona v. Gant*, 556 U.S. 332,

338 (2009)). The government bears the burden to "establish the applicability of an exception to the warrant requirement." *Taylor v. City of Saginaw*, 11 F.4th 483, 487 (6th Cir. 2021).

Among those exceptions is the warrantless search incident to a custodial arrest. *United States v. Edwards*, 415 U.S. 800, 802 (1974). The search-incident-to-arrest doctrine "has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained." *Id.* at 802–03. In *Riley v. California*, the Supreme Court explained that the exception is generally limited to "personal property . . . immediately associated with the person of the arrestee." 573 U.S. 373, 384 (2014) (quoting *United States v. Chadwick*, 433 U.S. 1, 15 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991)).

Generally, a search of an arrestee's personal property is lawful so long as the personal property is "within the immediate control of a subject at the beginning of an encounter with law enforcement officers" and when police officers "search the container at the scene of the arrest." *United States v. Dillard*, 78 F App'x 505, 513 (6th Cir. 2003) (quoting *United States v. Han*, 74 F.3d 537, 543 (4th Cir. 1996)); *see also United States v. Williams*, 483 F.3d 425, 430 (6th Cir. 2007) (same, citing *Chimel v. California*, 395 U.S. 752, 763 (1969)); *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001). "[E]ven if th[e] item is no longer accessible to the defendant at the time of the search," police may still search the item "[s]o long as the defendant had the item within his immediate control near the time of his arrest." *Northrop*, 265 F.3d at 379 (collecting cases). "The dimensions of the area within a suspect's immediate control depend on the specific context." *Williams*, 483 F.3d at 431 (collecting cases). However, for a search to be lawful, the accompanying arrest must also have been "lawful (*i.e.*, supported by probable cause and not otherwise unlawful." *United States v. Williams* ("*Williams II*"), No. 22-1365, 2023 WL 3815097, at *3 (6th Cir. June 5,

2023); *see also United States v. Robinson*, 414 U.S. 218, 235 (1973) ("It is the fact of the lawful arrest which establishes the authority to search.")

> b)    *Unlawful Search Claims Against Genualdi and Agius*

Genualdi and Agius both argue that their search of Palmer's purse was a lawful search incident to arrest. The plaintiff argues that the arrest was unlawful, so the search that flowed from it was likewise unlawful. (Doc. No. 51 at 12 (citing *Williams II*, 2023 WL 3815097, at *3).

As set forth above, the court finds that Genualdi's arrest of Palmer was supported by probable cause and that both Genualdi and Agius are entitled to qualified immunity from liability on the plaintiff's unlawful arrest claims. Moreover, the purse clearly qualifies as "personal property . . . immediately associated" with Palmer's person, *Riley*, 573 U.S. at 384; it was strapped close to her body and therefore was clearly within her immediate control, and the search occurred immediately after she had been taken into custody. Consequently, the search incident to arrest was also lawful. Finally, even if the arrest was not supported by probable cause, Genualdi and Agius are nonetheless entitled to qualified immunity on the unlawful search claims against them, based on their reasonable belief in the existence of probable cause.

> c)    *Unlawful Search Claim Against Swoner*

Swoner asserts that he was not personally involved in the allegedly illegal search and that the only possible basis for the assertion of such a claim against him is supervisor liability. The plaintiff argues that she plausibly alleges that Swoner "should have expected his subordinates to execute his [detention] order in the way that they did." (Doc. No. 49 at 15.)

Because, as set forth above, the search was lawful, Swoner cannot be liable under § 1983. Moreover, even if it were not lawful, it is well established that, to prevail on a claim under 42 U.S.C. § 1983, "a plaintiff must show that the defendant was 'personally involved in the [alleged] constitutional violations.'" *Abu-Joudeh v. Schneider*, 954 F.3d 842, 850 (6th Cir. 2020) (quoting

*Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). "This is because, in a suit for damages, '[e]ach defendant's liability must be assessed individually based on his own actions.'" *Id.* (quoting *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (alteration in original)). In the unlawful search context, "[a]s a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability." *Id.* (quoting *Binay*, 601 F.3d at 650).

For the same reasons, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Gray v. Shelby Cnty.*, No. 22-5542, 2023 WL 5237373, at *8 (6th Cir. Aug. 15, 2023) (quoting *Ashcroft*, 556 U.S. at 676). Rather, to be liable, a supervisor must commit "some 'active unconstitutional behavior.'" *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). Active unconstitutional behavior "can consist of encouraging the specific incident of misconduct or in some other way directly participating in it, or implicitly authorizing, approving, or knowingly acquiescing in the unconstitutional conduct of the offending officers." *Id.* at *8 (alterations, quotation marks, and internal citations omitted). "Such active behavior 'must be both a cause in fact and a proximate cause of the alleged injury.'" *Id.* (quoting *Crawford*, 15 F.4th at 762).

Here, it is undisputed that Swoner was not present during the search of the plaintiff's person or her purse and was not directly involved in it. Moreover, the plaintiff does not allege facts showing that he "implicitly authorized, approved, or knowingly acquiesced" in his subordinates' allegedly unlawful activities. His mere failure to take *more* action—to more closely supervise— the other officers' conduct does not subject him to supervisory liability. In short, Palmer does not allege any facts that would support direct or supervisory liability.

Swoner is entitled to dismissal of this claim for failure to state a claim for which relief may be granted.

### 3. Race Discrimination

Palmer alleges "[o]n information and belief" that the decisions to arrest and search her and to "hold onto [her] firearm after she had been more fully exonerated" were both "motivated at least in part based on her race." (FAC ¶¶ 296–97.) Based on this allegation, she asserts that the defendants violated her rights under the Equal Protection Clause of the Fourteenth Amendment.

To state an equal protection claim, Palmer must plausibly allege "that the [officer defendants] treated [her] disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Courser v. Allard*, 969 F.3d 604, 617 (6th Cir. 2020) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)). Indeed, the Sixth Circuit has repeatedly recognized that "[d]isparate treatment is a 'threshold element of an equal protection claim.'" *Daniels v. City of Wyo.*, No. 17-3133, 2017 WL 7661477, at *3 (6th Cir. Oct. 5, 2017) (quoting *Ctr. for Bio-Ethical Reform*, 648 F.3d at 379); *see also WCI Inc. v. Ohio Dep't of Pub. Safety*, 774 F. App'x 959, 963 (6th Cir. 2019) ("'The threshold element of an equal protection claim is disparate treatment . . . .'" (quoting *Dixon v. Univ. of Toledo*, 702 F.3d 269, 278 (6th Cir. 2012))).

"The party bringing a claim 'must allege that it and other individuals who were treated differently were similarly situated in all material respects.'" *Superior Commc'ns v. City of Riverview*, 881 F.3d 432, 446 (6th Cir. 2018) (quoting *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009)). In other words, "the comparative [person] 'must have dealt with the same [decisionmaker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the[ decision-maker's] treatment of them for it.'" *Umani v. Mich. Dep't*

*of Corr.*, 432 F. App'x 453, 460 (6th Cir. 2011) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). "Where '[t]he allegations contained in the . . . [c]omplaint as to disparate treatment amount to conclusory and unadorned assertions that, consequently, are not well-pleaded,' they are 'not entitled to a presumption of truth at this stage in the litigation.'" *WCI, Inc.*, 774 F. App'x at 964 (quoting *Ctr. for Bio-Ethical Reform*, 648 F.3d at 379).

In responding to the Motions to Dismiss, the plaintiff concedes that she "currently lacks information to allege 'comparator evidence'" as to either Genualdi or Agius. (Doc. No. 50, at 13; Doc. No. 51 at 12.) She nonetheless states that she has "alleged 'comparator evidence' against MNPD generally in its execution of roadside stops and searches, asserting a custom of race discrimination in stops, searches, and arrests." (Doc. No. 50 at 13; Doc. No. 51 at 13.) She believes that these allegations should be sufficient to permit her equal protection claims against these two defendants to survive their Rule 12 motions. They are not. In the sections of the FAC to which Palmer refers, paragraphs 264–71, she alleges, based on reports issued in 2016, 2018, and 2020, that the MNPD engages in race discrimination in conducting traffic stops. These reports say nothing about the type of detention at issue here, which was made pursuant to an (admittedly erroneous) eyewitness report, not a traffic stop. The FAC does not allege any facts to support the plaintiff's claims that either Agius or Genualdi violated the plaintiff's constitutional right to equal protection.

Regarding Swoner, the plaintiff argues that she *does* have comparator proof: that Palmer was treated very differently from the White, male bystander who reported that he had seen her exit the stolen truck. (Doc. No. 49 at 18.) Swoner argues in his Reply that the witness and Palmer were not similarly situated in any material respect. The court agrees. From a police officer's perspective, a witness who reported to the officer that he saw a woman get out of, and run away from, a stolen

truck is not similarly situated in any material respect to the woman the witness saw running away from the truck, and the plaintiff makes no effort to show that they are similarly situated. An eyewitness and a suspect running from a crime scene cannot be said to have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352; *see also, e.g.*, *Jolivette v. Husted*, 694 F.3d 760, 771 (6th Cir. 2012) (finding that the plaintiff's equal protection claims "do not get off the ground because independent candidates and partisan candidates [for political office] are not similarly situated for purposes of election regulations"); *Bojicic v. DeWine*, 569 F. Supp. 3d 669, 688 (N.D. Ohio 2021) (finding that the plaintiff dance studios "failed to allege any facts that would show that the essential businesses that Ohio allowed to remain open were similarly situated to their dance studios"), *aff'd*, No. 21-4123, 2022 WL 3585636 (6th Cir. Aug. 22, 2022); *Bartolomeo v. Brandon Charter Twp.*, No. 24-13190, 2025 WL 2428876, at *4 (E.D. Mich. July 31, 2025) (dismissing equal protection challenge to a zoning ordinance that treated residential and commercial properties differently, because "residential and commercial properties are not similarly situated in all relevant respects"). To make out an equal protection claim in this context, the plaintiff would likely need to show that Swoner has treated Black suspects differently than similarly situated non-Black suspects, or perhaps even White eyewitnesses differently from Black eyewitnesses. Without relevant comparator evidence, Palmer's equal protection claim against Swoner also fails

All three officer defendants are entitled to dismissal of the equal protection claims against them for failure to state a claim for which relief may be granted.

### 4. *Second Amendment Violation*

The plaintiff claims that Agius and Genualdi "seized [her] handgun without lawful justification" and that, by retaining her weapon for the duration of the drive to her home, even after

having exonerated her of any wrongdoing, they both violated her Second Amendment right to bear a firearm. (FAC ¶ 303.) She alleges that Swoner is also liable, because he was aware of the other officers' actions and "allowed them to retain control" of Palmer's firearm even after she had been exonerated. (*Id.* ¶ 306.) She asserts that the "individual Defendants acted in blatant disregard for Ms. Palmer's constitutional rights, both in the initial seizure of Ms. Palmer's handgun and in prolonging the seizure even after she had been even more fully exonerated and released from the handcuffs." (FAC ¶¶ 307–08.)

The Second Amendment protects the "the right of the people to keep and bear Arms." U.S. Const. amend. II. The Second Amendment is incorporated by the Due Process Clause of the Fourteenth Amendment and therefore "applies equally to the Federal Government and the States." *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). The Supreme Court has confirmed that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen . . . to carry a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8–10 (2022). Typically, litigation concerning the Second Amendment has focused on the constitutional validity of statutes limiting the type of firearms that may be carried or regulations limiting the granting of permits to carry firearms. *See, e.g.*, *id.* at 26 (explaining that the test it prescribed in that case and in *District of Columbia v. Heller*, 554 U.S. 570 (2008), "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding"). At the same time, the right to bear arms is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

The officer defendants all assert both that the FAC fails to state a claim for a constitutional violation and that, even if it did state a claim, they are entitled to qualified immunity. As already

discussed above, to determine whether an official is entitled to qualified immunity, the court must determine whether the officer's conduct violated a constitutional right and, if so, whether that right was "clearly established at the time of the alleged violation." *Bambach*, 92 F.4th at 623. The court may consider these questions in any order, and either may be dispositive.

To resolve a case on qualified immunity based on the second prong of the test referenced above, the right at issue "must be sufficiently clear—and defined at a sufficiently precise level— to ensure that 'every reasonable official would have understood that what he is doing violates' those rights." *Id.* at 622 (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam)). In other words, "[e]xisting law at the time of the alleged violation must have 'placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). Officials may be "'on notice' that their conduct is unconstitutional 'even in novel factual circumstances,' but the contours of the alleged rights violation must not be defined at too high a 'level of generality.'" *Id.* at 622–23 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "The plaintiff bears the burden of showing the law was clearly established at the time of the alleged violation." *Id.*

As discussed above, the plaintiff's purse was on her person when she was arrested and placed in Genualdi's police cruiser. As she was placed in the cruiser, her purse, with the handgun inside, was detained by the officer defendants. The video shows that she was deprived of her handgun during her detention for a little over nine minutes. Because the arrest was supported by probable cause, depriving the plaintiff of her handgun for that brief period did not violate her constitutional rights. Nor can the plaintiff point to any clearly established law holding otherwise. Moreover, even if the arrest were *not* supported by probable cause, the plaintiff acknowledges that "there does not appear to be any Sixth Circuit or Supreme Court precedent holding that the

temporary deprivation of a firearm pursuant to an illegal search and seizure is actionable under 42 U.S.C. § 1983." (Doc. No. 49 at 21.)

Then, when Palmer was offered and accepted a ride home, Agius retained her handgun for the additional four and one-half minutes it took to drive her home. The plaintiff has not pointed to any clearly established law that would have put the officer defendants on notice that not allowing an innocent civilian to have possession of her handgun while riding in the back of a police car violated the Second Amendment.

Instead, the plaintiff argues that, "even without on point precedent applying this right in the 42 U.S.C. § 1983 context against an individual officer who temporarily unlawfully deprives a citizen of her right to protect herself, qualified immunity should fail because the right at issue is 'obvious.'" (*Id.* (quoting *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 660–61 (6th Cir. 2021)).)

The Supreme Court, indeed, has recognized that "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). "Thus, when 'no reasonable [police] officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." *Moderwell*, 997 F.3d at 660 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020)). In *Taylor*, however, the Court held that, under the "particularly egregious facts of this case, any reasonable officer" should have known that the circumstances of the plaintiff's confinement violated the Eighth Amendment's prohibition of cruel and unusual punishment. *Taylor*, 592 U.S. at 9. In *Taylor*, the Court identified "a general constitutional rule already identified in the decisional law"—the Eighth Amendment's prohibition of cruel and unusual punishment—and held that it "appl[ied] with obvious clarity to the specific conduct in

question," even without a case involving precisely the same fact pattern. *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).[13]

With respect to the Second Amendment, however, as opposed to the Fourth or Eighth, the caselaw is only beginning to be developed, and the plaintiff cannot point to a "general constitutional rule already identified in the decisional law" that would have made it clear to the officer defendants that briefly depriving the plaintiff of her firearm during a *Terry* stop, during a lawful arrest (or even during an unlawful arrest), or during a brief voluntary ride to her home in the back of a police car could violate her Second Amendment rights or subject the police officers to liability under § 1983. In fact, the plaintiff has not pointed to any decisional law holding a police officer liable in his individual capacity under § 1983 for violating a plaintiff's Second Amendment rights. Moreover, while the right to bear arms outside the home is clearly established, the question of when and under what circumstances that right may be temporarily curtailed is not, so the court cannot find that the right "applied with obvious clarity" to the defendants' actions in this case in November 2023.[14] *Accord, e.g.*, *Shipley v. City of Chattanooga*, No. 1:23-CV-299-KAC-MJD,

---

[13] In *Taylor*, the plaintiff, a prisoner in state custody, alleged that he had been held "without clothing" for six days in a "pair of shockingly unsanitary cells." *Taylor*, 592 U.S. at 7, 8. The first cell was "covered, nearly floor to ceiling, in massive amounts of feces," and the second was freezing cold and "equipped with only a clogged drain in the floor to dispose of bodily waste," meaning that, when the plaintiff finally (involuntarily) relieved himself, the drain overflowed with raw sewage, and he was "left to sleep naked in sewage." *Id.* at 8 (internal quotation marks and citation omitted). *Hope* involved similarly obvious and egregious conditions of confinement, where the plaintiff was placed in leg irons and handcuffed to a hitching post, with his arms held above shoulder height, shirtless in the sun, with little water and no bathroom breaks, for seven hours. *Hope*, 536 U.S. at 734–75

[14] The Sixth Circuit very recently issued an opinion vacating summary judgment for a sheriff sued in his *official* capacity for violating the plaintiffs' Second Amendment rights. *Novak v. Federspiel*, 140 F.4th 815, 824 (6th Cir. 2025). There, however, the plaintiffs had "waived their individual-capacity Second Amendment claims" against the sheriff. *Id.* at 824 n.3. The court held that "[t]he right to keep or bear one's own firearms is quintessentially conduct that falls within the text of the Second Amendment," but it did not address an individual law enforcement officer's potential liability for violating the Second Amendment. *Id.* at 824.

2025 WL 366631, at *2 (E.D. Tenn. Jan. 31, 2025) (holding that, as of the December 18, 2022 incident at issue in that case, "no precedent clearly established that temporary seizure of a firearm incident to search with subsequent return of the firearm violated the Second Amendment"). Finally, depriving the plaintiff of her weapon for a total of fifteen minutes was not, in any sense, "egregious," as contemplated by *Taylor* or *Hope*.

The court finds, in short, that, irrespective of whether the officer defendants' actions violated a constitutional right, the law was not sufficiently clear at the time of the incident "to ensure that every reasonable official would have understood that what he [wa]s doing violate[d] those rights." *Bambach*, 92 F.4th at 622. The officer defendants are entitled to qualified immunity on the plaintiffs' Second Amendment claims against them.

## IV. METRO'S MOTION TO DISMISS

### A. Background

The plaintiff also states the same four claims (false arrest, unlawful search, violation of the Equal Protection clause, and violation of the Second Amendment) against Metro, asserting that (1) Metro is responsible for the illegal arrest, searches, and seizures "because of its systemic failure to discipline officers for conducting false arrests and illegal searches, leading to a custom of impunity for these types of Fourth Amendment violations" (FAC ¶¶ 278, 289); (2) "Metro is responsible for the illegal arrest, searches, and seizures because of its systemic custom of tolerating documented race discrimination against African Americans in roadside searches and arrests, and for being deliberately indifferent to an MNPD culture that treats African Americans who are lawfully armed as a threat" (*id.* ¶ 299); and (3) "Metro is responsible for the prolonged illegal seizure of Ms. Palmer's handgun, because on information and belief MNPD policy, training, and practice was the cause of the decision to hold onto Ms. Palmer's firearm while she was in the MNPD patrol car" (*id.* ¶ 307).

In support of these claims, the FAC documents the plaintiff's futile attempts to "seek justice through MNPD's biased complaint process," the decision by MNPD's Office of Professional Accountability ("OPA") to "exonerate[] Officers Genualdi and Agius of any wrongdoing," and OPA's failure to investigate Swoner (whom the plaintiff had not named in her OPA complaint). (FAC ¶¶ 245–59.) She asserts that the OPA's resolution of her complaint is "consistent with MNPD's decades-long *de facto* practice of almost always finding a way to justify MNPD officers' violations of citizens' constitutional rights" and that it reaches such conclusions by applying an "absolute certainty" burden of proof to citizen complaints, instead of the "preponderance of the evidence" standard it applies to administrative discipline. (*Id.* ¶¶ 260–61.) Palmer alleges that this standard is nearly impossible to meet and that the "statistics on MNPD's resolutions of citizen complaints" have "borne out this reality," as MNPD sustains only a "tiny faction" of citizen complaints. (*Id.* ¶¶ 261–62.)

In addition, Palmer alleges that MNPD police officers have, for many years, "employed roadside detentions and searches as a means of proactively attempting to detect criminal activity." (*Id.* ¶ 264.) Citing a 2016 report by a group known as Gideon's Army, entitled "Driving While Black – Nashville Report," a 2018 New York University Policing Report "documenting . . . statistical proof of race discrimination in MNPD's traffic stops," and a 2020 Davidson County Grand Jury Report that cited both, the plaintiff alleges that, despite repeated complaints of race discrimination, the MNPD has "steadfastly denied that its officers engage in race discrimination," has "failed to seriously address its race discrimination problem," and "tacit[ly] permit[s] its officers to rely on racial profiling," as a result of which "MNPD officers evidence particular implicit bias against African Americans who are armed." (*Id.* ¶¶ 269–71.)

Metro argues that it is entitled to dismissal of all claims against it for failure to state a claim for which relief may be granted. (Doc. No. 44.) It argues that, to survive dismissal of a municipal liability claim under 42 U.S.C. § 1983, the plaintiff must plausibly identify an unconstitutional policy and show that the policy led to the deprivation of the plaintiff's constitutional rights and that she has failed to do so with respect to each of the claims against Metro. The plaintiff, generally, argues that all of her claims are sufficiently pleaded. In the alternative, as discussed below, she has also filed a Motion to Amend and proposed Second Amended Complaint, which she contends should moot Metro's Motion to Dismiss.

### B.  Municipal Liability Under *Monell*

A municipality is a "person" within the meaning of § 1983. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Section 1983, however, "does not permit a municipal entity to incur liability under a theory of *respondeat superior*." *Id.* (citing *Monell*, 436 U.S. at 691). Instead, a municipality can incur liability under § 1983 "only where its policy or custom causes the constitutional violation in question." *Id.* More specifically, to state a claim for municipal liability based on a constitutional injury inflicted by a municipal employee, the plaintiff must plausibly allege "both that he suffered a [constitutional] injury *and* that the alleged violation was caused by the City's policy or custom." *Novak v. City of Parma*, 33 F.4th 296, 309 (6th Cir. 2022).

The Sixth Circuit has "identified 'at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom.'" *Franklin v. Franklin Cnty.*, 115 F.4th 461, 470 (6th Cir. 2024) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). These include: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.*

### C.       False Arrest/Unlawful Seizure Claims

To the extent the court has found that the FAC fails to state a colorable claim for a violation of Palmer's constitutional rights by the officer defendants, there is no constitutional violation for which Metro can be liable. However, insofar as the court has found in the alternative that the officer defendants are entitled to qualified immunity, further discussion is warranted.

As set forth above, the plaintiff asserts that Metro is liable for the alleged Fourth Amendment violations because of its "systemic failure to discipline officers for conducting false arrests and illegal searches, leading to a custom of impunity for these types of Fourth Amendment violations." (Doc. No. 32 ¶¶ 278, 289.) In other words, she appears to allege a "custom or tolerance or acquiescence of federal rights violations." To establish municipal liability on this basis, Palmer "must prove (among other things) that [Metro's] various failures amounted to 'a policy of deliberate indifference' to [her] constitutional rights." *Campbell v. Riahi*, 109 F.4th 854, 862 (6th Cir. 2024) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)). The Sixth Circuit has also explained that where, as here, the plaintiff pursues a municipal liability claim under an "inaction" theory, the plaintiff, to succeed, must show

> " (1) the existence of a clear and persistent pattern of" unconstitutional conduct; (2) "notice or constructive notice" on the part of the municipality; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) "that the [municipality's] custom was the 'moving force' or direct causal link in the constitutional deprivation."

*Franklin*, 115 F.4th at 472 (quoting *Thomas*, 398 F.3d at 429). To succeed on a claim under this theory, the plaintiff must plead "'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020) (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017).

That is, "there must be multiple earlier inadequate investigations and they must concern comparable claims." *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019).

In response to the Motion to Dismiss, the plaintiff asserts that, at the pleading stage, general allegations of a pattern of unconstitutional conduct are sufficient. (Doc. No. 52 at 4.) The court finds, however, that she does not actually allege a pattern of unconstitutional conduct. She alleges that the standard of proof Metro applies—"absolute certainty"—is too high and has resulted in the MNPD's sustaining only a "tiny fraction of citizen complaints." (FAC ¶¶ 261–62.) She alleges, in a wholly conclusory fashion, that, although OPA's investigations "appear on paper to be thorough, well documented investigations," OPA views claims through a "lens" that is "hopelessly biased in favor of officers." (*Id.* ¶ 261.)

These allegations are insufficient to establish deliberate indifference on the part of Metro. First, the plaintiff's allegations are insufficient to show that Metro mishandled her complaint. They only show that she was dissatisfied with the result. Further, even if she had adequately alleged a mishandling of her complaint, the court cannot "infer a municipal-wide policy based solely on one instance of potential misconduct," *Thomas*, 398 F.3d at 432–33, and Palmer fails to allege any other instance in which Metro ignored or failed to discipline clearly unconstitutional behavior on the part of police officers in situations factually similar to hers. In sum, even if the court accepted as true the proposition that the officer defendants involved in the November 2023 incident violated her Fourth Amendment rights, Palmer has offered no non-conclusory facts from which it may be plausibly inferred that Metro's deliberate indifference was the moving force behind those violations.

### D.    Equal Protection Claim

Regarding the viability of the plaintiff's equal protection/race discrimination claim against Metro, the court has found that the FAC fails to state a colorable claim against the officer

defendants for a violation of her right to equal protection under the Fourteenth Amendment. That is, the plaintiff does not plausibly allege a violation of her constitutional right to equal protection. Because she does not allege a constitutional violation, Metro cannot be liable for any purported violation. Count III against Metro is subject to dismissal for failure to state a claim for which relief may be granted.

###### E. Second Amendment Violation

Palmer asserts that Metro is liable for the officer defendants' violation of her Second Amendment right based on an unwritten policy, specifically an "unwritten practice of not permitting non-detained citizens to retain their firearms in MNPD patrol cars." (Doc. No. 52 at 8.) She asserts that her right to keep and bear arms under the Second Amendment is clearly established, and that Metro is not entitled to dismissal of this claim.

The Sixth Circuit recently reversed summary judgment on a Second Amendment claim for a sheriff named in his official capacity—that is, a municipal liability claim—in *Novak v. Federspiel* ("*Novak II*"), 140 F.4th 815 (6th Cir. 2025). In that case, the two plaintiffs alleged that they collectively owned fourteen firearms that had been seized in a criminal investigation that had terminated years before. The sheriff in charge of the investigation had refused to return their firearms on the basis that the plaintiffs had not proved that they owned them. *Id.* at 818. The district court granted summary judgment for the sheriff in his official capacity, holding, among other things, that the defendant's "retention of [the] fourteen firearms . . . did not violate the Second Amendment," largely because the defendant had not interfered with the plaintiffs' right to buy or own *other* guns. *Novak v. Federspiel*, 728 F. Supp. 3d 552, 578 (E.D. Mich. 2024), *aff'd in part, vacated in part, remanded*, 140 F.4th 815 (6th Cir. 2025). The Sixth Circuit reversed, holding that the Second Amendment clearly protected the right to "keep" arms, that it was well established that this term "protects a person's right to own guns for personal use," and that the right

"quintessentially . . . falls within the text of the Second Amendment." *Novak II*, 140 F.4th at 823, 824 (citing *Heller*, 554 U.S. at 628–29). The court remanded to the district court for a determination of (1) whether the plaintiffs owned the guns in question; and (2) whether the defendant's "possession of them has been 'consistent with the Nation's historical tradition of firearm regulation.'" *Id.* at 824 (quoting *Bruen*, 597 U.S. at 24).

This court is not equipped to make a historical determination of whether and to what extent the particular deprivation of the plaintiff's right to keep and bear arms at issue in this case (riding in the back of a police car for less than five minutes) is "consistent with the Nation's historical tradition of firearm regulation." Purely as a matter of common sense, however, the court finds that a policy or rule prohibiting citizens—particularly disgruntled citizens—from retaining their firearms while riding in a police patrol car does not seriously implicate a plaintiff's right to own, keep, or bear arms. Such a policy is consistent with a compelling state interest in protecting the safety of both the police and the citizens in question, and it is not clear that any less restrictive means of protecting that interest is available. Moreover, the plaintiff here was deprived of her firearm for the less than five minutes it took to drive her home—not the years at issue in *Novak II*. In short, even assuming the decision not to allow her to have her handgun back during that time period was the result of a Metro policy or custom, that custom was not unconstitutional. Metro is entitled to dismissal of this claim.

## V.    THE PLAINTIFF'S MOTION TO AMEND

### A.    Standard of Review

Federal Rule of Civil Procedure 15(a)(2) allows a party to amend its pleading only with the opposing party's consent or by leave of court. Rule 15(a)(2) adds that a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Despite this "liberal amendment policy," the denial of a motion to amend "may be appropriate when there is 'undue delay, bad faith

or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Brown v. Chapman*, 814 F.3d 436, 443 (6th Cir. 2016) (first quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002); and then *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). The party opposing a motion to amend has the burden of establishing futility. *Mason Sales, LLC v. Talent Creation, Ltd.*, No. 3:24-cv-00092, 2025 WL 696529, at *4 (M.D. Tenn. Mar. 4, 2025) (Newbern, M.J.) (citations omitted).

## B. Discussion

The plaintiff's proposed Second Amended Complaint ("SAC") includes new statistics based on data collected from 2005–2015, showing that, during that time frame, Metro sustained a "tiny fraction of citizen complaints" against Metro police officers. (Doc. No. 59-1 ¶¶ 265–66.) She alleges that, "[b]y 2016, numerous local Nashville grassroots organizations were actively working to pressure MNPD to reform because of its longstanding custom of allowing officers to commit Fourth Amendment violations with impunity." (*Id.* ¶ 270.) She includes new allegations about the delays involved before the MNPD finally began deploying body cameras, delays that allegedly resulted from the MNPD administration's "obstructive political tactics." (*Id.* ¶¶ 273–75.) She alleges that the MNPD exploited the lack of body cameras by crediting police officers' accounts over citizen accounts (*id.* ¶ 276)—an allegation of dubious relevance in this case, as all officers involved were wearing body cameras. The proposed SAC includes new allegations about a "pro-violence book entitled 'The Tactical Edge'" that, for many years, MNPD distributed to new

officers. (*Id.* ¶¶ 279–97.) The plaintiff alleges that, although MNPD no longer distributes this book, "the custom of impunity" to which the book contributed remains in place. (*Id.* ¶ 298.) The proposed SAC contains numerous allegations the relevance of which the court cannot discern concerning the unwarranted use of violence by Metro police officers and other issues. The SAC contains a few additional allegations regarding implicit bias and systemic racism. The proposed SAC does not contain any allegations regarding instances of allegedly false arrests based on misconceptions of what constitutes probable cause during a fast-moving and confusing investigation into a vehicular theft by a potentially armed suspect.

Metro opposes the Motion to Amend on the grounds that (1) the allegations are not new and consist of information that has long been in the possession of plaintiff's counsel and, in fact, are "recycled" from numerous other lawsuits filed by the same counsel; (2) the plaintiff fails to justify her failure to omit these new facts from the two prior iterations of her pleading; (3) the court should not countenance the type of gamesmanship deployed by the plaintiff; (4) Metro would be prejudiced by having to rebrief a fully briefed Motion to Dismiss; and (5) the proposed amendment would be futile.

The court finds that the proposed amendment would be futile. As set forth above, the court finds that the plaintiff's Second Amendment claim as set forth in the FAC fails as a matter of law, and the proposed SAC does not contain any new factual allegations that would call into question that conclusion. The court has also found that the FAC fails to state a colorable equal protection claim against the officer defendants and, therefore, that the equal protection claim against Metro also fails. New allegations that purport to bolster the equal protection claim against Metro do nothing to support the claims against the officer defendants or, therefore, against Metro.

Finally, the allegations intended to bolster the false arrest claim do not do so. The proposed SAC still does not contain any facts from which it may reasonably be inferred that Metro has exercised deliberate indifference by failing to train police officers on how to recognize probable cause or that it has failed to adequately investigate and discipline police officers who make arrests without the requisite probable cause. Moreover, even if the plaintiff is correct in this case that her arrest was not supported by probable cause, it presents a very close question, and she fails to show how any failures on the part of Metro are causally connected to the specific constitutional violations alleged here.

## VI. CONCLUSION

For the reasons set forth herein, the four Motions to Dismiss (Doc. Nos. 40, 41, 43, 45) will be granted, and the FAC will be dismissed in its entirety. The plaintiff's Motion to Amend (Doc. No. 59) will be denied as futile.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge